Sidney GOLOB, Appellant,

v.

W. E. STONE et al., Appellees.

No. 3601.

Court of Civil Appeals of Texas.

Waco.

Feb. 26, 1959.

Rehearing Denied April 2, 1959.

Riley, Jones, Boyd & Lovelace, Waco, for appellant.

Conway & Walker, Waco, for appellees.

**562**

TIREY, Justice.

Appellees brought this suit for legal services rendered to the defendant Sidney Golob and to Ewell Thompson, an alleged trustee. Appellees went to trial on their first amended petition and first amended answer to the cross-action. Among other things appellees alleged that on the 28th day of April, 1952, there was created by and between Ewell Thompson and Sidney Golob a trust relationship arising out of a written instrument executed by such parties, which created an express trust with Thompson as sole trustee, and Golob as sole beneficiary; that appellees, at the request of Thompson and Golob, rendered personal and legal services to such trust existing between the parties, and expended certain sums of money from their bank account on which a systematic record of such services and expenditures was kept, and that these services were expended in their capacity as attorneys for such trust and for the benefit of Golob; that appellees assisted Thompson in his capacity as trustee and Golob in connection with negotiations, preparation and compliance with a contract of sale and purchase between Mrs. Ruth Reed McCullough, individually and as independent executrix of J. R. McCullough, deceased, and George F. Sunkel and Ray Howard, doing business as McCollough, Sunkel and Howard, Piggly-Wiggly, as sellers, and Ewell Thompson, trustee for Sidney Golob as purchasers, such contract being dated May 1, 1952, and performable according to its terms and conditions. Appellees set out specifically the items of expenses necessarily incurred by them in the discharge of their duties as attorneys for the parties, and alleged that a reasonable attorneys' fee for such service was the sum of $7,500, and they prayed for such sum plus their expenses and charges incurred in this behalf.

Appellant Golob went to trial on his first original amended answer and cross-action, in which he entered a general denial, and further specifically denied that he received the benefits of the services alleged by ap-

pellees, and averred that appellees' services were rendered in behalf of Ewell Thompson and not for him. Golob, in his cross-action, alleged that such attorneys, acting through Emerson Stone, Junior, were actually representing Thompson but undertook and agreed to represent him. The cross-action alleged substantially that Stone devised a plan purporting to be a trust instrument, whereby it was agreed that Thompson would purchase certain grocery stores in his own name and hold them as trustee for Golob; that cross-plaintiff entrusted to Thompson the sum of $50,000 to be used as earnest money in connection with the purchase of the grocery stores, and it was further agreed between them that Golob, acting on his own, would procure an additional loan to take care of the balance of the purchase price; that it was agreed that the cross-defendant was to act as attorney for Golob, and that Thompson was to act as agent or trustee on behalf of Golob in connection with the purchase of the grocery stores; that Stone, by accepting employment as attorney, did place himself in a fiduciary relationship to Golob and that this relationship imposed upon Stone the highest degree of honesty and fair dealing in representing the exclusive interest of Golob, and that Stone was bound and obligated by virtue of his oath as an attorney, and by acceptance of employment, to serve his best interests in the purchase of the grocery stores; that Stone, in attempting to carry out his duties under the contract, entered into a conspiracy with Thompson whereby Thompson was to gain an equal control in behalf of himself in the grocery stores, and that Stone knew that such achievement would be adverse and in conflict with his interest, and that Stone, in the discharge of his duties, failed and refused to represent his best interest. Golob further alleged that because of the acts and conduct of Stone, that he suffered damages to the extent of $25,000, and the further sum of reasonable attorneys' fees in the amount of $2,000, and he prayed for such relief.

The jury, in its verdict, found substantially: (1) that Emerson Stone performed legal services in connection with Golob's attempt to purchase certain mercantile stores; (2, 3, 4, 5, 6, and 7) that these services were performed on behalf of Golob and with the knowledge and consent of Golob, and that Stone acted in good faith, and that such services were with the knowledge of Thompson as trustee for Golob, and with Thompson's consent; (8) that the reasonable value of the services performed by Stone in connection with the Golob matter was the sum of $6,500; (9) that the reasonable expenses incurred in this behalf was $195; (10) that Stone did not act in behalf of the interest of Thompson in matters adverse to Golob. (11) "What amount of money, if any, if paid now in cash, do you find from a preponderance of the evidence, if any, will reasonably compensate Sidney Golob for damages, if any, sustained by him as a natural result of Stone and Stone's acting adverse to his interest, if you have so found? Answer in dollars and cents, if any", to which the jury answered "None." (12) "Do you find from a preponderance of the evidence, if any, that the services, if any, of Stone and Stone during the time in question, were rendered solely for Ewell Thompson, individually? Answer 'Yes' or 'No' ", to which the jury answered "No."

The judgment followed the verdict, and it decreed that appellees recover judgment against Golob and against the defendant, Thompson, as trustee only for Golob, for the sum of $6,695, and that Golob recover nothing against appellees on his cross-action. The judgment further provided that it bear 6% interest from date it was entered, and it further decreed that all costs shall be paid by Golob and Thompson as trustee only for Golob, jointly and severally.

The court overruled defendant Golob's amended motion for new trial, and he has perfected his appeal to this court. Thompson did not appeal.

The judgment is assailed by twenty-three points. They are substantially to the effect that the court erred (1) in permitting witnesses to testify to the legal conclusions that Thompson was a trustee, and in trying the case and submitting issues on the theory that Thompson was a trustee; (2) in entering judgment against Golob when the evidence shows as a matter of law that Stone and Stone breached their fiduciary relationship as attorneys for Golob, thereby rendering void their contract of employment, and represented adverse and conflicting interests at the same time; (3 and 4) in permitting the witnesses Stone, Chandler, Rounsville and Thompson to testify to legal conclusions and in compelling Golob to testify to legal conclusions and the court's comments thereon, in the presence of the jury, and in permitting hearsay evidence; (5) in permitting Stone to testify concerning the trip to Florida in May, 1952, and as to services performed by him after June 16, 1952, and as to services performed after June 22, 1952; (6 and 8) in permitting the witnesses Chandler and Rounsville to testify as to the character and reputation of Stone, and his law firm, and in permitting such witnesses to answer hypothetical questions as to the value of the attorneys' services; (7) in excluding the letter written by Dallas Rupe & Son, as shown by Bill of Exception No. 1; (9, 10, 11, 12, 13 and 14) in refusing appellant's Requested Special Issue No. 1, inquiring as to whether Golob received any benefits from the services of Stone and Stone, and in refusing appellant's Issue No. 3, inquiring as to whether the services in question were rendered partly for the benefit of Thompson, individually, and in refusing Issue No. 5, inquiring as to whether appellees represented Thompson, individually, at the same time they were representing Golob, and in refusing appellant's Issue No. 6, inquiring as to whether the interests of Thompson, individually, and Golob, were conflicting; in refusing appellant's Issue No. 10, inquiring as to whether Stone and Stone, and Thompson, were acting under a scheme or plan

adverse to the interest of Golob; in refusing appellant's Requested Instruction No. 1. Points 15 to 23 inclusive complain of the failure of the court to sustain his objections to Special Issues Nos. 1, 2, 3, 4, 5, 6, 7, 8 and 9.

A statement is necessary. Evidence was tendered to the effect that Thompson and Golob had known each other since 1934, and during this time had had considerable business dealings with each other; that prior to April 25, 1952, Thompson was merchandise manager for Childs Food Stores, wholesalers, and this company was engaged in selling to and owning a number of retail grocery stores operating under Piggly Wiggly franchises in east Texas, Arkansas and Louisiana; that just prior to April 25, 1952, Thompson had resigned as merchandise manager for Childs Food Stores, his resignation to be effective April 30, 1952. During the month of April, 1952, exact date not given, several store owners, (about 15), operating twenty-two stores in the above territory contacted Thompson with the view of making a contract whereby he would serve them as their buyer, advertising agent and as their agent in the handling of trading stamps. These negotiations resulted in a contract being executed between these store owners and Thompson, under the terms of which Thompson was appointed as their agent in the capacity aforesaid, said contract being dated April 25, 1952, which was to become effective at midnight April 30, 1952, and to extend for a period of ten years. This instrument was called an operators' contract and included seven stores owned by the partnership of Sunkel, McCullough & Howard, in the Texarkana area; it appears that Golob was attempting to purchase through Thompson, as Trustee, the Piggly Wiggly stores. These seven stores had an annual gross sale of $7,500,000, and the rest of the stores involved in the operators' contract had an annual gross sale of about the same amount. The foregoing contract does not state the compensation which Thompson was to receive but evidence was tendered to the effect that he was to receive for his services ⅒oth of 1% of gross sales, and he so advised Golob. As we understand the testimony, George Sunkel, the managing partner of the seven Piggly Wiggly Stores, (prior to Thompson and Golob negotiations), had made Thompson an offer to take over as general manager of this firm at an annual salary of $25,000 per year, or to buy an undivided ⅓rd interest in the business, or to buy all seven stores; about this time, and prior to the negotiations between Golob and Thompson, Golob had sold his super market in Waco to HEB Food Stores under an agreement whereby HEB Stores leased his building for the sum of $1,000 per month and Golob was prohibited in his contract with them from going into the grocery business in the Waco territory for a limited time and Golob was anxious to get back into the grocery business in some part of the state outside of the prohibited area and with this in view he contacted Thompson, the first contact being sometime in March, 1952. That in April, 1952, Golob went to the home of Thompson in Jacksonville, Texas, for the purpose of discussing with Thompson the progress made to find stores that could be purchased by Golob, and it was at this time that Thompson told Golob about the Sunkel, McCullough & Howard stores in the Texarkana area; at this meeting Golob requested Thompson to call on Sunkel and secure from him a forty-five day option for the purchase of these stores in order that Golob could make the necessary financial arrangements to purchase such stores. Sunkel orally agreed to the forty-five day option; at this meeting Golob offered Thompson a one-half interest in the business if Thompson would handle the purchase; that Golob was to loan to Thompson the money for the purchase of such one-half interest, and Thompson was to repay Golob out of the profits of the business; shortly thereafter Golob called Thompson by telephone and advised him that his wife objected to Thompson owning a one-half interest in the business without putting up any money; that Golob told him that in any

event he could secure the purchase of the stores from the Sunkel partnership that he, Thompson, could buy one-half interest for the sum of $50,000 in cash. Thompson made this committment to secure the $50,-000, and so advised Golob by telephone. Golob, in his testimony, admitted that such agreement between him and Thompson was made, and that such agreement took place before he knew Emerson Stone, or his father. This oral agreement was reduced to writing and signed and acknowledged by the parties, Thompson and Golob, on the 3rd day of May, 1952. That after the oral option was obtained an appointment was made with Sunkel for Thompson and Golob to meet with him in Texarkana on the following Monday to close the purchase by Golob of the seven stores. It appears on April 28, 1952, Thompson came to Waco to see Golob, at which time he exhibited to him the operators contract and Thompson made an oral agreement with Golob that if Golob purchased the Texarkana stores, Golob would go along with the operators' contract. Golob testified to the effect that he understood the terms of this contract; it appears that while these parties were considering the above matter that Thompson, in the presence of Golob, called Emerson Stone at his office in Jacksonville and requested him to meet with them at Malakoff, Texas. Stone did meet with Golob and Thompson at Malakoff and there Golob employed Stone to do the necessary work in connection with his attempt to purchase the seven Texarkana stores. In Malakoff, Stone, at the request of Golob, drew a hand-written agreement between Thompson and Golob, which agreement the parties refer to in their pleadings as a trust agreement. This agreement was later typed and signed by the prospective parties. This agreement recites that Thompson is a trustee for the use of Golob in the purchase of the seven stores of the Sunkel, McCullough & Howard partnership at Texarkana, and title to these stores was to be taken in the name of Thompson, as trustee; however. at the cost and expense of Golob. The agreement further recites that upon the purchase of the seven stores that Golob assumes the position of store owner in their operators' contract with Thompson under date April 25, 1952. In this contract, among other things, we find this recital: "The considerations of this contract here entered into are as follows:

"1) That Ewell Thompson will purchase in his name as trustee for the benefit of Sidney Golob on such terms and conditions as they will hereinafter agree on with McCullough, Sunkel and Howard, of Texarkana, Texas and Arkansas, all seven stores operated by said partnership which are located as follows: (then follows the location of the particular stores);

"2) That Sidney Golob, who is the immediately purchaser beneficiary of this trust instrument agrees to and with Ewell Thompson here in two capacities, first, an individual capacity and second, in an agency capacity created of date of April 25, 1952, heretofore referred to herein, which contract herein confers a benefit on the principals whom Ewell Thompson represents which is not a primary benefit. Said Sidney Golob agrees that he will as purchaser of said business execute the contract of date of April 25, 1952, and will bind himself, his heirs and assigns to the same for its ten year period. The intent and purpose of this trust from a secondary standpoint is to keep a unit of store operations intact for mutual protection and welfare.

"3) It is further agreed that Sidney Golob is to bear all the expenses of the purchase of the business interests of McCullough, Sunkel and Howard and that Ewell Thompson, trustee herein is to have no responsibility or connection with the purchase of said interest referred to."

Thompson signed the contract in the capacity as trustee, and Golob as beneficiary.

Thereafter, on April 29, 1952, Thompson, Golob and Stone, Junior, met Sunkel and his partners at the law offices of Kennedy, Levee and Lee in Texarkana, this last firm representing the sellers and Stone representing Golob and Thompson. There in

conference the attorneys, with their respective clients, prepared a rather complicated contract, which was executed by Sunkel and his partners and Thompson in his capacity as trustee, and purchaser. This contract consisted of approximately thirteen pages of legal cap paper, some of which is single space. Pertinent to this discussion, it provided for the sale and transfer of the seven stores to Thompson in his capacity as trustee for Golob. The contract, among other things, provided that Golob would advance the sum of $50,000 in escrow to be held by the law firm of Kennedy, Levee and Lee. In the contract we find this recital:

"The total of all the aggregate sums in sub-paragraphs Nos. 1 through 7, inclusive, less the outstanding indebtedness, if any assumed by Purchaser as of June 1, 1952, shall be the agreed total base price of the sale of said stores and business, to which sum shall be added the sum of $50,000.00 as a bonus, making the total effective sales price of said business. The total effective sales price shall be paid by Purchaser to Sellers in cash or assumption of indebtednesses on or before June 15, 1952. Possession of the properties hereby contracted to be sold to be withheld until such cash settlement or assumption of indebtednesses is made to the satisfaction of Sellers, at which time bills of sale, assignments of leases and execution of the deed to the parking lot area above referred to shall be executed and delivered by Sellers to Purchaser as agreed under paragraph V below."

It is in evidence that the conferences and the preparation of this sales contract consumed some three days time working long hours. As we understand all the parties interested knew that Golob would have to obtain some loans in order to complete this purchase, but so far as we are able to tell no one doubted his ability to arrange for his finances, and we assume that the reason it was not discussed was due to the fact that the $50,000 placed in escrow would be forfeited in the event he failed to carry out his part of the contract. Moreover, the parties dealing with Golob would have the right to assume that he was in position to negotiate for such sums of money, if any, that he would or might need to close the contract; otherwise, he would not have put up a cash forfeit of $50,000. The contract was executed on May 1, 1952, and thereafter, on May 3, 1952, some of the parties left for Jacksonville, Florida for a conference with the President of Piggly Wiggly corporation for the purpose of securing a transfer of the Piggly Wiggly franchise from the Sunkel partnership for the trustee for Golob; those making the trip were Golob, Thompson, Stone, Junior, Howard and Sunkel. The consent for transfer of the franchise was obtained and Thompson and Stone left Florida on the same day. Testimony was tendered by Golob to the effect that he instructed Stone not to make this trip. Stone testified: "Mr. Golob didn't think it was necessary that I go along but at Mr. Thompson's instance I went." He further testified:

"Q. Now you testified that Mr. Golob told you not to go?

"A. He didn't tell me not to go. He said he didn't think it was necessary as I recall it to incur my time and expense on that trip."

Golob did not return to Texas with Stone and Thompson but remained in Jacksonville, Florida with Sunkel and Howard. As we understand the testimony, Golob did not advise Thompson or Stone that he would not be able to finance the purchase of these stores until after he returned from the Florida trip. Shortly after the Florida trip Golob went to Jacksonville, Texas and saw Thompson, at which time he asked Thompson to relieve him from his contract of date April 28, 1952, and this Thompson refused to do. This contract of April 28 is the one in which Golob assumed the obligations of the operators' contract of April 25, 1952, it appears that the sale price from the Sunkel's interest would be determined in part by the inventory of June 1, 1952, which was to be taken under the direction of Thompson and the sellers; that the operations of the business was to be under the

direction of Sunkel representing the sellers and Thompson for the purchase. The bank account was to be carried in the name of G. F. Sunkel-Ewell Thompson, Trust Account, in the Texarkana National Bank of Texarkana, and the moneys were to be withdrawn only upon the joint signatures of the sellers' agent, G. F. Sunkel, and Ewell Thompson, as Trustee, or agent for the purchaser. Thereafter, Golob refused to permit Thompson or his accountants to have anything to do with the taking of inventory. Golob took over the taking of the inventory as of June 1, 1952, and the complete management of the stores from June 1, 1952 to June 15, 1952. During this time Golob was in daily contact with Sunkel and Howard of the sellers. The testimony is to the effect that from the time that Golob returned from the Florida trip until June 16, 1952, the only contacts which Golob had with Thompson were in his efforts to get rid of Thompson and to get released from his contract of date April 28, 1952. Sunkel testified to the effect that he and Howard came to Golob and told him that they would let him off of the contract. Golob admitted that after taking of the inventory had been completed on June 1, 1952, that he had an agreement with Sunkel and Howard that they would release him from the obligation of contract of May 1, 1952, wherein Thompson was trustee; neither Stone nor Thompson knew of Golob's secret agreement with the Sunkel interest. Since Stone did not know of this agreement for cancellation he made a trip to Texarkana for a conference with Kennedy, Levee and Lee in order to prevent the forfeiture of the $50,000 Golob had placed in escrow; that while there he was in telephone contact with Golob in Waco three different times; that he had no knowledge or information that Golob had obtained a cancellation of his contract until he filed this suit; sometime after this Golob became associated with the Sunkel interest as general manager of the partnership stores in the Texarkana area under a contract whereby Golob was to receive 10% of the net profits of all stores; there was

testimony to the effect that the first year's net profit was in excess of $300,000, and that Golob received in excess of $30,000, and that Golob is at the time of the trial employed by the Sunkel interest as manager of the Piggly Wiggly stores in the Waco area.

In appellants brief we find substantially this statement: Without regard to Thompson's past association or lack of association with appellee, and without arriving at conclusions by way of assumption, the following facts are clear:

1. Appellee Stone and Stone undertook the representation of Thompson prior to April 28, 1952, and prior to the day that they agreed to represent Golob.

2. The "operators' contract" was prepared by appellee at Thompson's request and for his benefit.

3. With the exception of the omission of the phrase "heirs and assigns", the contract is drawn favorable to Thompson. We do not wish to give an opinion as to whether the absence of the phrase in the contract actually impaired Thompson's right, but it is in appellee's unqualified testimony that in his opinion the absence of the phrase was detrimental to Thompson.

4. The stores were to be known as "The Ewell Thompson Stores" and according to the "trust agreement" Golob's stores were to become a part of "The Ewell Thompson Stores."

Appellee testified that so far as he knew Thompson had informed Golob concerning the contents of the "operators' contract" before the "trust agreement" was signed on April 28, 1952. Golob was a grocer and not an attorney, and it certainly must be conceded that he needed legal counsel. Appellee testified that representation on and after April 28, 1952, was for Golob. Under Canon of Ethics Nos. 6, 8 and 34, of the State Bar of Texas, appellee was bound to disclose to Golob all that he as an attorney knew of Thompson's "operators' contract" and the legal effect of the contract as it af-

fected Golob or would affect him, and to advise Golob of the legal effect of the "trust agreement" which Golob signed. Several pages of testimony are in the Statement of Facts starting at page 163 and running through page 183, where an effort was made to obtain from appellee testimony as to what advice was given Golob at the time in question. On page 183, Statement of Facts, lines 6–25, appellee finally sums up his part in drawing the "trust agreement" as follows:

"They explained it to me that that was their agreement. I am not the man that started this deal. All I had to do there was to write up what they had agreed to do; put it in phraseology where it would accomplish what they wanted and would bind Mr. Thompson to transfer to Mr. Golob when they had it completed. That's all I was to do.

"Q. Are you through? A. Yes.

"Q. With all of this up to this time, you still haven't advised Mr. Golob one thing of his rights under this contract. You say they were all telling you. A. At Malakoff they were all telling me what they wanted to do and they had agreed to do, and what was going to take place if they purchased these stores.

"Q. Isn't it a fact that Ewell Thompson was telling you all the time and you were writing it down, just what Ewell Thompson told you? A. Certainly. He told me the majority of it, but everything was OK'ed by Mr. Golob. If you know how he operates, he doesn't say much."

■ We have given much time to the consideration of the testimony tendered in this cause and the briefs, as well as the various instruments executed by the parties and tendered in evidence. We see no evidence whatsoever of bad faith or breach of duty on the part of either Mr. Stone, Sr., or Junior, in their connection with the representation of Thompson and Golob. The instrument referred to as the "operators' contract" which the evidence shows was drawn by Mr. Stone, Sr., at Thompson's request, and before these negotiations occurred in which Stone, Junior, participated, are not unusual. This record shows that Thompson and Golob, and all the parties that they were dealing with in this entire transaction were experienced in the grocery business, dealing in what might be termed "big business" operations. The "operators' contract" has clarity and we think a man experienced in that business could understand it, and no doubt Golob did understand it; otherwise, he would not have agreed to be bound by it, and as we understand appellant's brief he has not pointed out in any respect wherein the contract legally favored Thompson as against Golob, or any of the parties who first signed it. Whether the "operators' contract" was wise from the standpoint of Thompson and the other parties who signed it, or whether it was wise for Golob to agree to operate under the terms and provisions of it, is not before us. These were questions that these experienced business men must decide, each for himself. That leads us to say that we see no breach of legal duty on the part of the Stones in the drawing of the "operators' contract". The next major question that presents itself to us is: Did Stone, Junior breach his duty to Golob in drawing the contract at Malakoff referred to by the parties as the "trust agreement", which agreement designated Thompson, trustee, and Golob as the beneficiary? We think the answer is "No," and that this discussion should not be labored. First of all the record shows that Thompson and Golob were well acquainted with each other's abilities and capabilities and success in the conduct of their various business operations up to the time that these negotiations began. They sought the services of appellees and explained to them what they wanted to do. What Thompson and Golob related to Stone as to what they were trying to do was certainly free from all fraud and misrepresentation, and there was no legal reason why these gentlemen should not enter into a contract to conduct their

business in this manner if they wanted so to do. Whether it was the wisest way for them to undertake this operation is not before us. Thompson and Golob had the responsibility of determining that question, and this, they did.

In appellant's second point he says substantially, that the Court erred in entering judgment against him when the evidence shows as a matter of law that appellees, Stone and Stone, breached their fiduciary relationship as attorneys for him, thereby rendering void their contract of employment because they represented adverse and conflicting interest at the same time. Appellant in discussing this point in his brief says, among other things:

> "It makes no difference which theory appellee chooses to take, the breach of a confidential, fiduciary relationship, whether to one client or in attempting to represent conflicting interests of two clients, produces the same result so far as the attorney's right to compensation is concerned.

> "An attorney who attempts to represent adverse and conflicting interests, though he acts in good faith, forfeits his right to recover attorney's fees from a party whose interest he has not wholly represented."

Again, appellant says in his brief:

> "We have not heretofore, and we do not now before this Court, attack the motives and actions of a brother lawyer without serious consideration of our duty to uphold the profession and its members, and we are mindful of our sacred duty to our client, the appellant. There is no intention to be unfair to appellee, but we cannot take lightly the uncontradicted exhibits and unqualified testimony of appellee, Emerson Stone, Jr., and we draw therefrom the only logical conclusions. Appellee's actions from beginning to end, and at every turn, must be closely examined to determine whether in behalf of one client it was his duty to contend for that which duty to the other required him to oppose."

We are not in accord with any of appellant's views which he seeks to sustain in this case. On the contrary we think appellant's observations and conclusions are in irreconcilable conflict with the controlling factual situation here developed. First of all, Thompson and Golob sought Stone's advice; they knew from experience what they desired to accomplish and they sought the services of Stone in this behalf. At the request of Thompson and Golob, Stone prepared the papers which he believed would accomplish what these gentlemen desired to do. We have previously detailed at some length the result of all of these negotiations between Golob and Thompson, and between the Sunkel interest at Texarkana, and we see no bad faith or breach of duty or favoritism on the part of Stone for Thompson or for Golob, but throughout these negotiations it seems to the Court that Stone was acting faithfully, sincerely and earnestly seeking to accomplish the very thing that Thompson and Golob started out to do; that Stone performed his services successfully is shown by the contract that he helped to prepare bearing date 1st day of May, 1952, executed by Sunkel and his associates, by Ewell Thompson acting in the capacity as trustee, which contract Golob was thoroughly familiar with and sat through in the preparation, and which contract was satisfactory to Golob at the time it was executed. As we understand this record the foregoing contract, if it had been completed by Golob, would have accomplished what Thompson and Golob told Stone they were trying to do and wanted to do. Wherein, then, did Stone breach his duty to Golob up until the day of the signing of the contract of May, 1952? It is our view that the record wholly fails to tender any evidence of bad faith or breach of duty or any conduct on the part of Stone unbecoming to a lawyer. In fact, we think the record conclusively shows that he acted faithfully, diligently and no doubt satisfactorily to both Thompson and Golob, because this contract, as we understand it, has not

been assailed. It is true that Golob contends that he advised Stone not to take the trip to Florida, but the evidence is without dispute that Golob made no attempt to discharge him at that time, and since Stone had accepted employment to see that the contract between Thompson and Golob was accomplished, we think he had a duty to see that he did everything possible to consummate the contract between the parties until he was discharged, and under Stone's testimony he thought it was his duty to go, and this Court is of the same view. Did Stone ever fail in his duty to represent the true interest of Golob? We find nothing in the record to so indicate, but on the contrary when the time for final closing of this purchase agreement was to be consummated in Texarkana, we find Stone present at the appointed time, at the proper place to protect the interest of Golob and Thompson. Did Stone discharge his full duty to Golob in objecting to the forfeiture of the $50,000 when Golob refused to complete the purchase agreement? The record conclusively shows that he did. It is true that at the time that Stone was seeking to prevent the forfeiture of this $50,000 that Golob may have already entered into a secret agreement with Sunkel and Howard that he would be relieved from his contract, and that the $50,000 would not be forfeited; but neither Stone nor Thompson knew of such an agreement. Moreover, it appears from the record that after the Sunkel interest had agreed to the cancellation of the contract and to a waiver of the forfeit that Thompson was unwilling so to do and that a request was made of Stone to help secure Thompson's consent to waive the forfeiture before the cancellation contract could be effectively made. The record is without dispute that Stone put forth his best efforts to secure Thompson's release, and that he did, thereafter, on June 27, 1952, secure a release from Thompson and caused it to be delivered to the proper parties which authorized the escrow holder to turn over the $50,000 forfeit money to Golob. Does the foregoing action of Stone show a breach of duty on his part to Golob, and was Golob

benefited by Stone's services in this respect? We think the answer to each of the foregoing questions is obvious. As we view the record the net result of Stone's services as an attorney was to obtain for Golob and Thompson exactly what they thought they wanted to do; that when the contract was executed accomplishing their purpose, Golob decided that he did not want to complete the purchase agreement. Golob's reasons for not doing so are not pertinent here nor have they been adjudicated; however, he was successful in getting the contract annulled, his forfeit money released, and he came out with a connection with the Sunkel interest that earned for him a salary of over $30,000 for the first year of its operation. Insofar as this record goes, Golob capitalized on the efforts of Thompson and Stone and neither Stone nor Thompson has received anything except experience. We are here concerned only with Stone's services. That leads us to say that the only conflict we see between the interest of Golob and Thompson was when Golob refused to perform the purchase agreement and asked that his forfeit money be restored to him. Stone took Golob's side of this controversy and successfully secured Thompson's consent to release the money to Golob.

* * * "As a reviewing court, it is our duty to consider the evidence and the inferences properly to be drawn therefrom in the light most favorable to the party obtaining the verdict, and it is our duty in considering controverted issues of fact to accept as true that testimony which tends to support the verdict." 3-B Tex.Jur. pp. 370 and 372. Moreover, "Where the facts are controverted, or are such that different inferences may be reasonably drawn therefrom, an issue of fact is raised; it is only where the evidence is harmonious and consistent, and the circumstances permit of but one conclusion, that the question becomes one of law for the determination of the court. An issue of fact is raised 'if, discarding all adverse evidence, and giving credit to all evidence favorable to the plain-

tiff, and indulging every legitimate conclusion favorable to the plaintiff which might have been drawn from the facts proved, a jury might have found in favor of the plaintiff.'" (Citing cases.) See Olds v. Traylor, Tex.Civ.App., 180 S.W.2d 511, 514, points 8 and 9, writ ref. Moreover, "'It was the jury's province to weigh all of the evidence, to decide what credence should be given to the whole or to any part of the testimony of each witness. "The jury were the judges not only of the facts proved, but of the inferences to be drawn therefrom, provided such inferences were not unreasonable."'" See Burt v. Lochausen, 151 Tex. 289, 249 S.W.2d 194, at page 199, point 6. No rule is better settled than the one to the effect that if there is evidence of probative value to sustain the findings of the jury, the appellate court is bound by such findings. The only modification of the Rule stated in Lynch v. McLendon, Tex.Civ.App., 283 S.W.2d 88, pt. 3, (N.W.H.) and cases there collated, is found in In re King's Estate, 150 Tex. 662, 244 S.W.2d 660. It is our view that the verdict of the jury is not against the great weight and preponderance of the evidence.

Returning to a discussion of appellant's points on which he grounds this appeal, it is our view that the Court did not err in refusing and over-ruling appellant's objection to his charge, nor did the Court err in over-ruling appellant's specially requested issues, but on the contrary it is our view that the Court submitted the ultimate and controlling issues in his main charge to the jury, and the Court's charge fully complied with Rule 277 and Rule 279, (Texas Rules of Civil Procedure) and the amendments thereto. See also Wichita Falls & Oklahoma Ry. Co. v. Pepper, 134 Tex. 360, 135 S.W.2d 79. We think we should add that we are of the further view that the evidence is ample to sustain the jury's verdict. We have considered each and every point set out in appellant's brief and we are of the view that none present reversible error and each is over-ruled. Accordingly, the judgment of the trial Court is affirmed.